487 So.2d 1226 (1986)
STATE of Louisiana, Plaintiff-Appellee,
v.
Jean Alan ROUX, Defendant-Appellant.
No. CR 85-465.
Court of Appeal of Louisiana, Third Circuit.
March 5, 1986.
Writ Denied June 6, 1986.
*1227 D. Michael Mooney, Lake Charles, for defendant-appellant.
Jerry G. Jones, Dist. Atty., Cameron, for plaintiff-appellee.
Before STOKER, DOUCET and YELVERTON, JJ.
STOKER, Judge.

HISTORY OF THE CASE
The defendant, Jean Alan Roux, was convicted of first degree murder, a violation of LSA-R.S. 14:30, for murdering his mother, Dorothy Mae Roux. The crime occurred on December 17, 1983, in Cameron, Louisiana. Roux, who was sixteen years old at the time of the crime, pleaded not guilty and not guilty by reason of insanity. After a hearing on March 7, 1984, the court held that Roux was not competent to stand trial. He was sent to the East Feliciana Forensic Facility for testing and care until the court found him competent to stand trial. He was later found to be competent.
Selection of a jury began on February 11, 1985. On February 17, 1985, the jury unanimously found the defendant guilty of first degree murder. Roux's motion for a new trial was denied, and on February 18, 1985 the jury recommended that Roux be sentenced to life imprisonment without benefit of probation, parole or suspension of sentence. He was ultimately sentenced by the court in accordance with the jury's recommendation. The defendant appeals his conviction and sentence. The defendant claims the court erred (1) in not granting the defendant's motion to suppress inculpatory statements made by the defendant, (2) in not granting the defendant's challenges for cause of two jurors and granting a challenge for cause to the state for one juror, (3) in allowing Dr. Thomas Fain to testify as an expert in the field of psychology concerning the defendant's ability to distinguish right from wrong at the time of the crime inasmuch as Fain is a psychologist, not a psychiatrist, and he never saw the defendant professionally, (4) in allowing Fain to read from a medical report not written by him and not entered into *1228 evidence and which contained the opinions of other doctors not called to testify, (5) in allowing a psychiatric nurse, not qualified as an expert, to state an opinion as to the "affect" of the defendant, and (6) in that the verdict was contrary to the law and the evidence in light of the psychiatric testimony concerning the defendant's inability to distinguish right from wrong at the time of the crime.

FACTS
On December 17, 1983, the defendant, Jean Alan Roux, a sixteen-year-old school drop-out, was in his room listening to music. His father had left the house to feed his calves. While the father was out of the house, Roux walked into the kitchen and shot his mother, Dorothy Roux, with a .38 caliber pistol. He returned to his room and listened to the music for a few more minutes before returning to the kitchen where he shot his mother again. Mrs. Roux died as a result of massive bleeding in the lung caused by the gunshot wounds.
When the defendant's father, Daniel Roux, Jr., returned to the house he noticed that the door was opened and the lights were out. As he stepped into the house to investigate, he was struck in the arm by a shotgun blast. Roux, who had armed himself with a shotgun before his father's return, then proceeded to beat him over the head with the shotgun. The defendant fired the shotgun again, striking his father across the abdomen. The father began talking to his son and convinced his son to bring him some water and then to go outside and pray for forgiveness. The father went inside, locked the door, and called the sheriff's office for help.
The defendant went next door to the home of his grandparents. He told them he had killed his mother and shot his father. The family rushed next door to investigate. The defendant also returned, took his father's car, and fled.
A roadblock had been set up near the scene of the crime. The defendant ran through the roadblock, overturning his father's car. He was stopped by Deputy Hebert when he got out of the car and attempted to run. He was read his Miranda rights immediately and Deputy Hebert proceeded to take him to the Cameron Parish jail. No attempt was made to solicit any statement from the defendant. In fact, there was no attempt to even question the defendant. While enroute to the jail the defendant made several unsolicited inculpatory statements.
When he arrived at the sheriff's office, he was again carefully advised of his rights. The officers were aware that special circumstances existed because the defendant was sixteen years of age. They called and finally contacted a judge to advise them of the proper procedure to follow in dealing with a juvenile charged with a serious crime. No attempt was made to interrogate the young man. Special care was taken when they advised the defendant of his rights in order to be sure that he understood each sentence. He continued to make unsolicited inculpatory statements.

SUPPRESSION OF INCULPATORY STATEMENTS
The defendant claims that the trial court erred in denying a motion to suppress inculpatory statements made by defendant. The defendant bases his claim on two grounds. His counsel first argues that any inculpatory statement made by a juvenile outside the presence of a parent, guardian, attorney, or any other person with the best interest of the juvenile in mind is not admissible in a court of law. This rule is purportedly gleaned from State in the Interest of Dino, 359 So.2d 586 (La.1978), cert. denied, 439 U.S. 1047, 99 S.Ct. 722, 58 L.Ed.2d 706 (1978).
We believe that defendant's counsel misstates the Dino rule when he takes it out of the context of facts as they appeared in the Dino case. The Dino case dealt with the valid waiver of the constitutional rights of a minor in a custodial interrogation situation. The court found that a juvenile could not make a valid waiver of Miranda rights without the presence of a *1229 parent or interested party. But a waiver of rights is only necessary when the defendant is in police custody and is undergoing police interrogation.
The Louisiana Supreme Court, in State v. Burge, 362 So.2d 1371 (La.1978) at page 1374, pointed out the following:
"The Dino guidelines dealt specifically with the police interrogation of a juvenile. Here, however, the police were not interrogating Morrow. The police had arrested him and had advised him of his Miranda rights. He was immediately placed in the police car, and there he made an entirely unsolicited, inculpatory statement that he had participated in the rape and kidnapping.
"All three officers present at the time Morrow made his statement testified emphatically that he had not been questioned, threatened, or abused.
* * * * * *
"Both of Morrow's statements were unsolicited; therefore, our Dino rules relating to the interrogation of a juvenile are inapplicable. The trial court, therefore, properly denied defendants' motion to quash those two statements."
There is no allegation in the case before us that any of the defendant's statements were the product of police interrogation. Roux's statements were unsolicited; therefore, as in State v. Burge, supra, the Dino rule is inapplicable.
The second ground upon which the defendant bases his claim that his inculpatory statements should be suppressed is that his mental capacity precluded the statements from being free and voluntary.
In State v. Glover, 343 So.2d 118 (La.1976), on rehearing, the Louisiana Supreme Court explained that the state bears the burden of proving beyond a reasonable doubt that a confession or inculpatory statement is free and voluntary. This proof is necessary irrespective of whether the statement is a product of custodial interrogation or not. The court explained further that the state may rely on the presumption of sanity provided in LSA-R.S. 15:432. The defendant then bears the burden of proving by a preponderance of the evidence his "insanity" at the time of the confession. The court further clarified this statement by explaining that although the defendant bears the burden of proving the existence of a mental abnormality, which under the circumstances may have destroyed the voluntary nature of his confession, he is not required to prove a particular kind of "insanity." Nevertheless, the ultimate burden of proving the voluntary value of the statement remains with the state.
In State v. Trudell, 350 So.2d 658 (La. 1977), at page 661, the court restated the rule laid down in State v. Glover, supra:
"While a claim of mental illness normally requires a defendant to establish by a preponderance of the evidence that he has a mental illness, where the voluntariness of his confession is at issue the state, having the burden of establishing that the confession was voluntary, still retains that burden. State v. Glover, supra. In such a case, the state must prove that defendant's level of mental illness did not preclude him from giving a voluntary statement and that he did in fact do so."
In State v. Lefevre, 419 So.2d 862 (La. 1982), the court discussed the great discretion afforded the trial judge concerning his assessment of the defendant's ability to understand his rights and the consequences of his speech. At page 865 the court stated:
"The law is clear that when the issue on appeal is whether an accused's level of intellectual disability precludes him from effectively understanding the essential nature of his rights to silence and counsel and of the consequences of his speech, much weight is accorded to the trial court's assessment. State v. Coleman, 395 So.2d 704 (La.1981); State v. Trudell, supra; State v. White, 329 So.2d 738 (La.1976). Once the trial judge has determined that the state has met its burden of proof, his decision is entitled to great weight on review. State v. Coleman, *1230 supra; State v. White, supra; State v. Hall, 257 La. 253, 242 So.2d 239 (1970)."
In the case before us it does not appear that the court erred in finding that the state had met its burden.
Three psychiatrists testified on behalf of Roux opining that Roux was compelled to talk and that he may not have fully understood the consequences of his actions. On cross-examination their testimony was considerably weakened. The decision appeared to have been based solely on a clinical interview. There was strong testimony of lay persons who indicated Roux's apparent understanding of the situation.
In State v. Lefevre, supra, the court stated:
"Opinions of experts on the question of `waiver' of constitutional rights may be helpful but are not binding on the trial court. The decision on the validity of a waiver is ultimately for the court. There is no controlling psychiatric principle. State v. Coleman, supra. See also State v. Bennett, 345 So.2d 1129 (La.1977)."
The trial court was not bound by the opinions of the psychiatrists. Considering their testimony as a whole and the conflicting testimony of the lay witnesses, we find no error on the part of the trial judge in finding that the statements were freely and voluntary given.

CHALLENGES FOR CAUSE
The defendant claims that the trial court erred in not granting the defendant's challenge for cause of the jurors, Dorothy Gibson (juror # 61) and Gilbert Hebert (juror # 64). He further alleges that the trial court erred in granting the state's challenge for cause of the juror Steve Olander Bourriague (juror # 37).
Since the defendant exhausted all of his peremptory challenges, he is entitled to complain of any error which may have occurred when the court denied his challenge for cause. State v. Heard, 408 So.2d 1247 (La.1982); State v. Sylvester, 400 So.2d 640 (La.1981); LSA-C.Cr.P. art. 800, Comment (a). LSA-C.Cr.P. art. 797 lists the grounds upon which a defendant can base a challenge for cause:
"Art. 797. Challenge for cause
The state or the defendant may challenge a juror for cause on the ground that:
(1) The juror lacks a qualification required by law;
(2) The juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient ground of challenge to a juror, if he declares, and the court is satisfied, that he can render an impartial verdict according to the law and the evidence;
(3) The relationship, whether by blood, marriage, employment, friendship, or enmity between the juror and the defendant, the person injured by the offense, the district attorney, or defense counsel, is such that it is reasonable to conclude that it would influence the juror in arriving at a verdict;
(4) The juror will not accept the law as given to him by the court; or
(5) The juror served on the grand jury that found the indictment, or on a petit jury that once tried the defendant for the same or any other offense."
The defendant argues that juror Dorothy Gibson should have been excluded because her son had been subpoenaed by the state to testify as a witness. Her son had been employed by the sheriff's department at the time of the crime. Upon questioning by defense counsel this juror stated that she would believe her son if he testified because she did not think he would lie. The court then asked if the state in fact would call her son to testify. The state at that time assured the court that the prospective juror's son would not testify. In all other respects this juror indicated that she would be a fair and impartial juror.
In State v. Heard, supra, at page 1249, the Supreme Court explained:
"It is well settled that relationship to a law enforcement officer is not of itself *1231 grounds for a challenge for cause. State v. Sonnier, 379 So.2d 1336 (La.1980); State v. Qualls, [353 So.2d 978 (La. 1977)]. The question involved in this case is whether Mrs. Sheridan could assess the credibility of each witness independent of his occupation. The trial judge is affording great discretion in making this decision, and his decision will not be overturned absent an abuse of that discretion. A challenge for cause is often unwarranted where a prospective juror at first expresses an opinion prejudicial to the defendant, but upon further inquiry demonstrates the ability and willingness to decide the case impartially by listening to the evidence and following the trial court's instructions. State v. Bates, 397 So.2d 1331 (La.1981); cf. State v. Claiborne, 397 So.2d 486 (La. 1981)."
With the removal of her son as a witness, it is clear that the trial judge found any bias or reason for bias had also been removed.
Defendant claims that juror Gilbert Hebert should have been excluded because his brother was employed by the district attorney's office. At page 410 in State v. McIntyre, 381 So.2d 408 (La.1980), cert. denied, 449 U.S. 871, 101 S.Ct. 209, 66 L.Ed.2d 90 (1980), the Supreme Court stated:
"We have held that the mere fact that a juror is related to a participant in the case does not disqualify the juror from service. The party challenging the juror must also show that the relationship would influence the juror in arriving at a verdict. State v. Gray, 351 So.2d 448 (La.1977); State v. Jones, 345 So.2d 1157 (La.1977)."
Hebert's testimony at voir dire indicated that he would give the defendant a fair hearing and apply the law as the court directed. The trial judge must have believed that this juror would render an unbiased judgment. The trial court has great discretion in making the determination concerning the impartiality vel non of a prospective juror. The record supports his decision to deny the challenge.
The jurisprudence also supports the court's decision to deny the challenge. State v. Williams, 445 So.2d 1171 (La. 1984); State v. Smith, 398 So.2d 1090 (La. 1981), State v. James, 431 So.2d 1075 (La. App. 2d Cir.1983), writ denied, 439 So.2d 1076 (La.1983); State v. Love, 434 So.2d 448 (La.App. 2d Cir.1983), writ denied, 441 So.2d 750 (La.1983).
The defendant complains that the trial judge erred when he granted the challenge for cause made by the state concerning the prospective juror Steve Olander Bourriague. The record indicates that this prospective juror had spoken to the defendant's father before the voir dire began.
LSA-C.Cr.P. art. 799 grants the state eight peremptory challenges per defendant in trials in which the offense is punishable by death or necessarily by imprisonment at hard labor. The minutes reveal that the state only exercised six of these challenges.
LSA-C.Cr.P. art. 800 provides in pertinent part:
"B. The erroneous allowance to the state of a challenge for cause does not afford the defendant a ground for complaint, unless the effect of such ruling is the exercise by the state of more peremptory challenges than it is entitled to."
Since the state did not exhaust its peremptory challenges, the defendant cannot attack the granting of a challenge for cause by the trial court. This assignment of error lacks merit.

EXPERT TESTIMONY
The defendant complains that Dr. Thomas Fain, a psychologist, should not have been allowed to testify as to the defendant's ability to distinguish right from wrong at the time of the commission of the act. He further argues that Fain should not have been allowed to read statements from a report from the East Feliciana Forensic Facility since the report was not prepared by Fain, nor was it entered into evidence.
Fain was a rebuttal witness for the state. Before the trial judge accepted Fain as an *1232 expert in the field of forensic psychology, Fain's qualifications were considered. At the time of the trial Fain had been the chief clinical psychologist at the East Feliciana Forensic Facility for about four years. This maximum security facility houses persons accused of crimes but found not competent to stand trial and individuals who have been accused of crimes, tried, and found not guilty and not guilty by reason of insanity. Fain had worked at a similar facility in California for the three preceding years. He explained to the court that he specialized in forensic psychology which is similar to clinical psychology but "serves as an interface to law and psychology." He had qualified as an expert on previous occasions and testified in that capacity. He responded in the affirmative when the court asked him if he was qualified to diagnose mental illness.
Clearly, the trial judge did not err when he accepted Dr. Fain as an expert in psychology. Likewise he did not err when he allowed Fain to testify as to the defendant's ability to distinguish right from wrong at the time of the commission of the act.
Fain was accepted as an expert without objection on the part of defendant. The state had begun direct examination when defense counsel objected to Fain's testimony concerning defendant's ability to distinguish right from wrong. According to State v. Fink, 255 La. 385, 231 So.2d 360 (1970), if a witness has been accepted as an expert and has begun to testify on direct examination before the jury, the competence of the witness cannot be reopened.
The trial court was correct when it denied the defendant's objection concerning Fain's qualifications. The court in State v. Andrews, 369 So.2d 1049 (La.1979) stated at page 1051:
"As in the case of any expert witness, the nature and extent of his education, training or experience should go to the weight of his testimony, rather than its admissibility."
Our jurisprudence also indicates that an expert can testify to the conclusion he reached based on examinations performed by others. In State v. Andrews, supra, at page 1051, the court addressed this issue as follows:
"Medical experts are expected to rely in part on tests and examinations performed by others in arriving at their opinions and this reliance does not render their opinions inadmissible hearsay. State v. Nicolaus, 340 So.2d 296 (La. 1976); State v. Vincent, 338 So.2d 1376 (La.1976). Although the expert witness in the present case is a psychologist, rather than a physician, these rules apply equally to him when he is testifying in the area in which he has special training and experience. See R.S. 15:464."
Fain could refer to reports not entered into evidence. In State v. Williams, 346 So.2d 181 (La.1977), both the defense and state medical experts were permitted to refer freely to facts in medical reports which were not admitted into evidence.
The trial court made no error in admitting Dr. Fain's testimony.

LAY OPINION TESTIMONY
The defendant argues that Mary Lynn Wiley, a psychiatric nurse, should not have been allowed to testify as to the "affect" of the defendant since she was not qualified as an expert. There was no contemporaneous objection at the time of her testimony, but in any case her testimony was correctly included.
In State v. Swails, 76 So.2d 523 (La. 1954), cert. denied, 348 U.S. 983, 75 S.Ct. 574, 99 L.Ed. 765 (1955), the court laid down a general rule concerning lay opinion evidence of insanity:
"[A] non-expert witness, basing his testimony on facts and circumstances known to him, may be permitted to give opinion testimony touching upon the sanity or insanity of a person whose mental condition is at issue, provided the witnesses be shown to have had ample opportunity to observe the speech, manner, habits and conduct of such person." *1233 Wiley was working in the emergency room when Roux was brought in for treatment. The record indicates that she had the time and opportunity to observe his behavior, thus her testimony was proper.

INSANITY DEFENSE
The defendant claims that, on the issue of insanity, the verdict was contrary to the law and the evidence. This question was not formally briefed as a separate issue in defendant's brief and should thus be considered abandoned, but since the subject is alluded to in the brief as a whole we will consider the issue.
The defendant argues that since three psychiatrists testified that the defendant could not distinguish right from wrong at the time of the crime, he should have been found not guilty by reason of insanity.
We find that the testimony of the three psychiatrists was not unequivocal on this issue. On cross-examination, they all agreed that Roux realized that what he was doing was wrong. This weakening in their testimony, combined with Dr. Fain's testimony and other lay testimony, is enough to support the jury verdict of guilty.
Dr. Fain testified that Roux was not insane at the time of the crime. He based his opinion on the result of several standardized clinical tests which are used to determine medical conditions pertinent to this case. He also based his opinion on interviews given by several staff members on different occasions while Roux was at the forensic unit.
The three psychiatrists based their opinions solely on one or two 50 to 60 minute interviews with no psychological testing.
The jury could have concluded from the evidence presented that Roux could distinguish right from wrong at the time of the crime. Therefore, their refusal to render a verdict of not guilty and not guilty by reason of insanity was not contrary to the law and the evidence.
AFFIRMED.