NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

22-659

STATE OF LOUISIANA

VERSUS

DERRICK CARDET WITHERS

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 15098-15
HONORABLE ROBERT LANE WYATT, DISTRICT JUDGE

**********

CANDYCE G. PERRET
JUDGE

**********

Court composed of D. Kent Savoie, Candyce G. Perret, and Ledricka J. Thierry, Judges.

AFFIRMED.

**Stephen C. Dwight**
**District Attorney**
**Post Office Box 3206**
**Lake Charles, LA   70601**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**David S. Pipes**
**Assistant District Attorney**
**901 Lakeshore Drive**
**Lake Charles, LA   70601**
**(337) 437-3400**
**COUNSEL FOR APPELLEE:**
     **State of Louisiana**

**Chad M. Ikerd**
**Louisiana Appellate Project**
**Post Office Box 2125**
**Lafayette, LA   70502**
**(225) 806-2930**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **Derrick Cardet Withers**

**Derrick Cardet Withers**
**Louisiana State Prison**
**Falcon-3**
**Angola, LA   70712**
**DEFENDANT/APPELLANT:**
     **IN PROPER PERSON**

**PERRET, Judge.**

Defendant Derrick Cardet Withers was convicted of two counts of aggravated rape, violations of La.R.S. 14:42. He was sentenced to life imprisonment without the benefit of probation, parole, or suspension of sentence on both counts, and his sentences are to run concurrently. He now appeals his convictions alleging that the evidence was insufficient to support his convictions and that the trial court erred in several respects, specifically, in allowing a doctor's testimony regarding the victim's identification of her abuser; in failing to rule on Defendant's pro se motion for new trial; and in failing to suppress the results of Defendant's urine sample, violating his due process rights. For the following reasons, we affirm Defendant's convictions and sentences.

**FACTUAL AND PROCEDURAL HISTORY:**

A Calcasieu Parish Grand Jury charged Defendant with two counts of aggravated rape, in violation of La.R.S. 14:42, in 2015. The State amended the indictment in 2018 to specify the date ranges of the offenses. The birth dates of the victims, as listed on the indictment, indicate the victims were less than thirteen years old when the offenses occurred.

After various pretrial motions, a jury began hearing evidence on December 2, 2021. Through the evidence and testimony, the following facts were adduced. On March 31, 2015, Brittney Withers brought her daughter Z.W. to pediatrician Dr. Krishnakumari Kanesan, due to eczema. Dr. Kanesan noticed an unusual stain on Z.W.'s panties and tested her for, among other things, chlamydia, a sexually transmitted disease. The results returned positive for vaginal chlamydia. Upon receiving the results, Dr. Kanesan set up a second appointment for Z.W and tested

Z.W.'s younger sister, D.W. D.W.'s test results also returned positive for vaginal chlamydia.

Mrs. Withers testified that, after Dr. Kanesan informed her Z.W. had chlamydia, Z.W. identified Defendant as the person "who did it[.]" When Mrs. Withers returned home from the appointment, she confronted Defendant and he responded, "I did it and it was the drugs." Defendant's aunt also testified that she confronted Defendant and that he admitted to touching Z.W., again, blaming drugs.

Andrea Fontenot was a detective working for Juvenile Domestic Sex Crimes with the Lake Charles Police Department at the time of these events. Det. Fontenot testified that a call came in from the Southwest Louisiana Health Center that a seven-year-old patient had tested positive for chlamydia. She responded to the clinic where she spoke with Dr. Kanesan, Brittney Withers, and Z.W. Thereafter, Det. Fontenot set up an interview at the Child Advocacy Center ("CAC") as well as scheduled an appointment for Z.W. with Dr. Scott Bergstedt, a gynecologist. Det. Fontenot also prepared a search warrant for Defendant's urine sample, which was executed.

Pursuant to a warrant, Defendant submitted a urine sample to a sexual assault nurse examiner (SANE) at Lake Charles Memorial Hospital, which was then sent for testing at Quest Diagnostics in California. The clinical lab scientist from Quest Diagnostics testified regarding the results. Defendant's sample tested positive for chlamydia. An arrest warrant for Defendant was issued thereafter.

The arresting officer, Sergeant Mayo Romero of the Lake Charles Police Department, testified that Defendant expressed surprise at the speed of his arrest and thought he would have time to leave town, while his urine test was pending. In a recorded call from jail on April 8, 2015, Defendant made additional indirect admissions regarding his conduct, blaming it on his drug use.

Dr. Scott Bergstedt, a gynecologist and an expert in forensic sexual examinations, performed an exam on Z.W. on April 28, 2015, and on D.W. on May 12, 2015. He testified that in addition to having chlamydia, both Z.W.'s and D.W.'s hymens were missing, which is indicative of repeated penetration. Dr. Bergstedt noted that the physical findings were consistent with sexual abuse. Dr. Bergstedt also testified, and it was in his reports, that both Z.W. and D.W. named Defendant as the "suspect." Though defense counsel objected to this portion of the testimony, the trial court overruled the objection.[1] Dr. Bergstedt further testified that vaginal chlamydia cannot be contracted from a finger.

Both girls gave recorded interviews at the Children's Advocacy Center. Z.W. was interviewed in 2015, but D.W. did not give an interview until 2018. Z.W. reported that Defendant put "nasty stuff" in her mouth and in her "butt." D.W. reported that Defendant put his "thing" in her. Z.W. and D.W. both testified at trial, with the CAC interviews being published and played for the jury. At trial, each of the girls identified Defendant as the offender. Also, Z.W. testified she was thirteen at the time of the trial; D.W. testified she was twelve.

The victims' brother, M.W., gave a recorded statement at the CAC as well as testified at trial. He was fifteen at the time of the trial. He testified the girls were both scared of Defendant and would not look at Defendant when he walked into the room. He also testified that he had witnessed Defendant calling his sister into a room. In his recorded statement given at the CAC, he stated that Defendant would take Z.W. into a room and M.W. would hear her scream. However, he never saw what was going on.

---

[1] This testimony is at the heart of Defendant's Assignment of Error Number Two and is addressed therein.

On December 3, 2021, the jury found Defendant guilty of both charges. At a hearing held on January 26, 2022, the district court denied a motion for new trial. On February 22, the court noted that it had reviewed and denied a pro se motion for new trial and two similar counsel-filed motions. Defendant filed a second pro se motion for new trial, which the court also denied.

On February 23, 2022, the district court sentenced Defendant to serve two concurrent life sentences, without benefit of probation, parole, or suspension of sentence.

Defendant now appeals his convictions assigning four errors:

    I.      The State failed to sufficiently prove that [Defendant] was guilty of two counts of aggravated rape.

    II.      The trial court erred in allowing doctors to testify regarding accusations by ZW and DW of who physically assaulted them. The exception to hearsay under art. 803(4) applies to statements relevant for treatment and diagnosis. "Who" gave them chlamydia was irrelevant for those purposes, even if "how" was relevant.

    III.      The trial court erred in not ruling on [Defendant's] pro se motion for a new trial. It was filed before sentencing, and therefore, is presumed to be timely filed. This Court should remand the case to the trial court for a hearing on the issues raised in the pro se motion for new trial.

    IV.      [Defendant's] due process rights were violated by the State's failure to secure for future testing his urine sample it alleged showed proof he had chlamydia. The State choose [sic] a lab that did not properly preserve evidence. The trial court should have suppressed the evidence.

**ERRORS PATENT:**

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we note there is one error patent, but that error requires no corrective action by this court as explained

4

further below, and another potential error patent raised and discussed in Assignment of Error Number Two.

The first error resulted in an illegally lenient sentence; the trial court failed to impose each sentence for aggravated rape at hard labor even though this is required by La.R.S. 14:42. Although the commitment order indicates the life sentences are to be served in the Department of Public Safety and Corrections, the sentencing transcript does not so indicate, and in the event of a conflict, the sentencing transcript prevails. *State v. Williams*, 15-498 (La.App. 3 Cir. 12/9/15), 181 So.3d 857, *writ denied*, 16-26 (La. 1/13/17), 215 So.3d 242; *State v. Jones*, 18-862 (La.App. 3 Cir. 5/1/19) (unpublished opinion). Although the authority to correct an illegally lenient sentence is granted and discretionary under La.Code Crim.P. art. 882, this court will not consider an illegally lenient sentence unless it is an error raised on appeal. *State v. Mayfield*, 18-420 (La.App. 3 Cir. 12/6/18), 261 So.3d 101, *writ denied*, 19-46 (La. 5/28/19), 273 So.3d 316. *See also State v. Brown*, 19-771 (La. 10/14/20), 302 So.3d 1109 (supreme court found the court of appeal erred in vacating an illegally lenient sentence absent any complaint by the State). Additionally, we do not correct the inaccuracy in the commitment order noted above as doing so may lead to confusion. *Cf. State v. Mayer*, 99-3124 (La. 3/31/00), 760 So.2d 309.

**ASSIGNMENT OF ERROR NUMBER ONE:**

In his first assignment of error, Defendant argues that the evidence adduced against him at trial was insufficient to support his convictions for aggravated rape. On appeal, the general test for sufficiency is well-settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct.

5

2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (citing *State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

At the time of the offenses, La.R.S. 14:42 defined aggravated rape.[2] The statute stated, in pertinent part:

> A.     Aggravated rape is a rape committed . . . where the anal, oral, or vaginal sexual intercourse is deemed to be without lawful consent of the victim because it is committed under any one or more of the following circumstances:
>
> . . . .
>
> (4) When the victim is under the age of thirteen years. Lack of knowledge of the victim's age shall not be a defense.

Initially, Defendant does not appear to contest that the two young victims suffered sexual abuse. As stated earlier, both girls had chlamydia and missing hymens. Although the record does not directly address the victims' ages at the time of the offenses in 2015, it is abundantly clear that they were both under the age of thirteen. Z.W. testified she was thirteen at the 2021 trial, and D.W. testified she was twelve.

---

[2] Louisiana Revised Statutes 14:42, was subsequently amended by La. Acts 2015, Nos. 184 and 256 to rename the crime of aggravated rape as "first degree rape." *See* La.R.S. 14:42(E) (explaining that "aggravated rape" and "first degree rape" mean the offense defined by this statute and any reference to the crime of aggravated rape is the same as a reference to the crime of first degree rape).

On appeal, Defendant argues that the State failed to prove his identity as the perpetrator of the crimes at issue. He cites *State v. Anderson*, 13-42 (La.App. 3 Cir. 7/3/13), 116 So.3d 1045, *writ denied*, 13-1806 (La. 5/16/14), 139 So.3d 1019, and the well-settled principle that where identity is a key issue, the State must negate any reasonable probability of misidentification. However, he also acknowledges the equally-settled principle that the testimony of a single witness regarding identity is sufficient to support a conviction. *State v. Neal*, 00-674 (La. 6/29/01), 796 So.2d 649. Defendant first claims that Z.W. "would not identify Derrick in court." After reviewing the pertinent colloquy, we find this is a mischaracterization of Z.W.'s testimony:

> MR. ROBINSON: Okay. So we just published S-5. Do you recognize that video?
>
> Z.W.: Yes.
>
> MR. ROBINSON: What was that we just watched?
>
> Z.W.: The video talking -- the video of me talking about what happened to me.
>
> MR. ROBINSON: So you remember being there?
>
> Z.W.: Uh-huh.
>
> MR. ROBINSON: Okay. So I want to ask you first about the Dietrich versus Derrick and Uncle D and Uncle Wick conversation there. Did you remember that happening just now?
>
> Z.W.: Uh-huh. Yeah.
>
> MR. ROBINSON: So can you explain to the jury what happened?
>
> Z.W.: Like can you repeat that again, please?
>
> MR. ROBINSON: Sure. In that interview you were talking about Uncle Wick, right?
>
> Z.W.: Uh-huh.

MR. ROBINSON: And at some point she asked you, what's Uncle Wick's real name and you said Dietrich.

Z.W.: Uh-huh.

MR. ROBINSON: And then it seemed like you got confused because you were talking about Uncle D. And you said, wait, there's Uncle Derrick.

Z.W.: Uh-huh.

MR. ROBINSON: And so what is Uncle Wick's real name?

Z.W.: Dietrich? Dietrich.

MR. ROBINSON: You're still not sure today?

Z.W.: No.

MR. ROBINSON: Okay. Do you see Uncle Wick in the courtroom?

Z.W.: Yes.

MR. ROBINSON: Can you point at him? Can you look at him for me?

Z.W.: Huh -huh.

MR. ROBINSON: You don't wanna --

Z.W.: I'm sorry, I can't.

MR. ROBINSON: You shook your head, no. And so have you seen him while you've been in the courtroom today?

Z.W.: Yes.

MR. ROBINSON: And so why don't you want to look at him?

Z.W.: It's just disgusting to me.

MR. ROBINSON: Okay. Is he -- is he sitting at this table? I'm going to walk over to the defense table. Is he sitting here, Z.W.?

Z.W.: Yes.

MR. ROBINSON: But you don't want to look at him because he's disgusting to you.

Z.W.: Yes.

MR. ROBINSON: Is there any chance that it was your other uncle who did these things to you?

Z.W.: No.

MR. ROBINSON: So the fact that you're saying Dietrich versus Derrick, you just don't know his name.

Z.W.: Yeah, I don't remember. Because it's kinda alike to me.

MR. ROBINSON: So I want to ask you about some other specifics. Do you remember any other specific occasions other than what was discussed in the video?

Z.W.: Yes.

MR. ROBINSON: Can you share that with the jury, please?

Z.W.: I remember being asleep in my bed and I remember waking up because he woke me up and then I remember going to his room. And after that I blacked out. And then, I guess I don't know what happened next. I don't remember at least.

MR. ROBINSON: Do you remember any occasions where he would ask you to get something out from under the bed?

Z.W.: Yes.

MR. ROBINSON: What was that about? Can you tell the jury?

Z.W.: He would always ask me to pick up something from under the bed.

MR. ROBINSON: What would he do to you when you were going to pick something up?

Z.W.: Touch me.

MR. ROBINSON: Where would he touch you?

Z.W.: I guess you could say like on my butt and stuff.

MR. ROBINSON: Uh-huh. When you were talking on the video, you were talking about his finger being in your privates.

Z.W.: Uh-huh.

MR. ROBINSON: Is it possible that as a little kid you thought it was his finger but it was something else?

Z.W.: I could be, but I don't remember. Because I never looked like behind me, at least.

MR. ROBINSON: Okay. You said you never looked behind you. So where would he be when he was putting his finger inside your private part?

Z.W.: Behind me or like on the side of me.

MR. ROBINSON: And you wouldn't look at him.

Z.W.: Huh -huh.

MR. ROBINSON: Okay. And yeah, you're shaking your head no. So it's possible then that it was his private part instead of his finger and you just didn't see it.

Z.W.: Yes, it's possible.

MR. ROBINSON: Z.W., do you have anything to gain by pointing at your used to be Uncle Wick, the man who you just pointed at in court today?

Z.W.: Can you explain that?

MR. ROBINSON: Sure. Are you going to gain anything? Do you have any reason to lie?

Z.W.: No.

MR. ROBINSON: If this man gets convicted are you going to benefit from that in any way?

Z.W.: No.

The transcript shows that Z.W. was not *unable* to identify Defendant in court; she simply did not want to look at him. Also, she was confused about his true first name, but not his identity as the offender.

Next, Defendant notes his trial counsel's allegation that during separate custody proceedings, the victims' mother had asked to have her then-boyfriend

tested for chlamydia. However, the victim's mother testified that she did not remember making that request.[3]

Defendant also argues that the State failed to identify him as the perpetrator because in multiple statements, Z.W. indicated that Defendant penetrated her vagina with his fingers and put his penis in her mouth. Since medical testimony indicated that chlamydia cannot be passed along with the fingers, and the victims never developed oral chlamydia, Defendant argues that "[t]he logical conclusion is that [he] is not the person who did any of these assaults on Z.W."

Further, Defendant suggests that D.W. was coached by her grandmother, Barbara Richard, regarding her rape. Mrs. Richard testified that she explained the term "rape" to D.W., but that the child told her what had happened to her. Defendant cites testimony that he believes suggested some form of coaching:

> MR. ROBINSON: And your aunt told you that you had been raped?
>
> D.W.: Yes.
>
> MR. ROBINSON: Did your aunt tell you who raped you?
>
> D.W.: Yes.
>
> MR. ROBINSON: So she told you who raped you?
>
> D.W.: Her and my grandmother.
>
> MR. ROBINSON: So -- so your aunt and your grandmother told you that he raped you, right?
>
> D.W.: Yes.

But on redirect, the State clarified:

> MR. ROBINSON: When you gave that interview were you telling the truth or were you telling a lie?

---

[3] It does not appear that documentation from the custody proceeding was entered into the record.

D.W.: I was telling the truth.

MR. ROBINSON: Okay. And I appreciate that very much. And when you pointed at Uncle Wick today and you recognized him in the courtroom, what do you remember that he did to you?

D.W.: He raped me.

MR. ROBINSON: And are you saying that because your grandma told you to say that? Or are you saying that because you remember it?

D.W.: I'm saying that because I remember.

MR. ROBINSON: And when you were talking with your grandma about it was she helping you understand what had happened to you?

D.W.: Yes.

MR. ROBINSON: Did anybody tell you to say this or do you remember this?

D.W.: I remember this.

MR. ROBINSON: If Uncle Wick gets convicted do you gain anything here?

D.W.: Huh?

MR. ROBINSON: Like do you have any reason to lie? Is anybody going to pay you or buy you anything?

D.W.: Huh -huh.

MR. ROBINSON: You're shaking your head no. So why are you here testifying to what you said today?

D.W.: Because.

MR. ROBINSON: Is it the truth?

D.W.: Yes.

In his brief, Defendant also argues that the damage to the girls' hymens could have had a non-sexual origin. Further, he argues that the recorded jail call does not

12

show that he did anything to the girls with his penis. He also argues that he never admitted to anything more than touching the victims.

After careful review of the record, we find no merit to Defendant's first assignment of error and, instead, find the facts support the verdicts. The two victims, well under the age of thirteen at the time, tested positive for chlamydia. Defendant, an uncle of the girls who lived with them, also tested positive for chlamydia. Dr. Bergstedt determined that the girls had missing hymens. Chlamydia is a sexually transmitted disease, and a damaged or missing hymen is indicative of vaginal penetration. In separate remarks to the girls' mother, the girls' aunt, to the arresting officer, and in a phone call from jail, Defendant acknowledged some form of inappropriate contact with the girls. Further, to paraphrase part of Defendant's jail call, he stated he did not know where the State got the "aggravated" part of the charges from, as he claimed the victims did not bleed or cry. It is noteworthy that Defendant did not express confusion regarding why there were rape charges against him. In his remarks, he claimed that his drug use played a role, although he does not now claim that his alleged drug use affected his ability to form criminal intent. Lastly, the girls identified him as the offender.

Z.W. testified she was not completely sure whether Defendant penetrated her vagina with his fingers or his penis. D.W. told an interviewer at CAC that Defendant put his "thing" in her. Regarding discrepancies in the evidence, given their young age, it is possible that the two young victims did not understand the acts that Defendant did to them at the time of the rapes. Further, an established principle of Louisiana law is that juries are free to believe some, none, or all of the evidence presented to them. *State v. Perkins*, 11-955 (La.App. 3 Cir. 3/7/12), 85 So.3d 810.

13

Pursuant to *Kennerson* and *Perkins*, we cannot say that the jury's decision to convict Defendant was irrational. For the reasons discussed, this assignment lacks merit.

**ASSIGNMENT OF ERROR NUMBER TWO:**

In his second assignment of error, Defendant argues that the district court erred by allowing a doctor to testify regarding statements that Z.W. and D.W. made during medical examinations. During an exam, one of the girls identified Defendant as her assailant. In its ruling, the district court relied on the hearsay exception in La.Code Evid. art. 803(4) to permit the doctor's testimony regarding the identification of the assailant. Louisiana Code of Evidence Article 803(4) allows the use of testimony related to medical treatment:

> Statements for purposes of medical treatment and medical diagnosis in connection with treatment. Statements made for purposes of medical treatment and medical diagnosis in connection with treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to treatment or diagnosis in connection with treatment.

In support of the trial court's ruling, the State cites *State v. Williams*, 12-252, pp. 20-24 (La.App. 4 Cir. 4/17/13), 115 So.3d 600, 611-13, *writ denied*, 13-1411 (La. 11/22/13), 126 So.3d 477, wherein the fourth circuit concluded a doctor could relate the identification of the sexual abuser by the victim as an exception to hearsay under La.Code Evid. art. 803(4), and, if permitting said testimony was not permissible, it would be subject to a harmless error review:

> A trial court's ruling as to the admissibility of evidence will not be disturbed absent a clear abuse of discretion. *State v. Cyrus*, 2011-1175, p. 20 (La.App. 4 Cir. 7/5/12), 97 So.3d 554, 565, citing *State v. Richardson*, 97-1995, p. 14 (La.App. 4 Cir. 3/3/99), 729 So.2d 114, 122. Also, a trial court is vested with much discretion in determining whether the probative value of relevant evidence is substantially outweighed by its prejudicial effect under La. C.E. art. 403. *State v.*

*White*, 2009-0025, p. 9 (La.App. 4 Cir. 9/16/09), 22 So.3d 197, 204. Further, a trial court's ruling admitting/permitting the introduction of evidence carries with it an implicit conclusion that the trial court found that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, as per La. C.E. art. 403. *State v. Magee*, 2011-0574, p. 49, fn. 37 (La.9/28/12), 103 So.3d 285, 320, fn. 37 ("Although the district court did not specifically rule on the admissibility of the statements under La. C.E. art. 403 (perhaps because it was not asked to), the Court admitted the statements, implicitly finding that their probative value substantially outweighed the danger of 'unfair prejudice, confusion of the issues, or misleading the jury.' La. C.E. art. 403.").

The State cites *State v. Morgan*, 45,110, pp. 26-27 (La.App. 2 Cir. 4/14/10), 34 So.3d 1127, 1143, where the court held that a statement by a hospital physician that a rape victim reported to the hospital because she had been sexually assaulted was an exception to the hearsay rule because it was made for the purpose of medical treatment and diagnosis. This is the hearsay exception provided by La. C.E. art. 803(4). However, that statement by the victim in *Morgan* apparently was just a general one that she had been raped or sexually assaulted. The victim did not identify/name her attacker in the statement, as T.W. did in the instant case.

The State also cites *State v. Thom*, 615 So.2d 355, 363 (La.App. 5 Cir.1993), where the defendant complained on appeal that the trial court had erred in permitting an emergency room nurse at a hospital where a rape victim was treated to testify concerning statements the victim made concerning her complaints and how her physical and sexual attack occurred. The court held that this evidence was admissible pursuant to La. C.E. art. 803(4). The court stated:

> These statements were pertinent to the diagnosis of the victim's physical and psychological condition and the type of trauma which the victim suffered. They were also pertinent to determine the treatment which was necessary for the victim's physical and psychological injuries.

*Thom*, 615 So.2d at 363.

In *State v. Coleman*, 95-1890 (La.App. 4 Cir. 5/1/96), 673 So.2d 1283, the victim was referred to a physician by the district attorney's office some eighteen months after the alleged sexual abuse occurred. The victim received no treatment as a result of the evaluation. This Court recognized that, although a subsidiary purpose of the examination was the identification and treatment of any sexually transmitted diseases or other physical harm that may have resulted from

the rape, the "principal reason for the examination was forensic." 95-1890 at p. 5, 673 So.2d at 1287.

Accordingly, this Court found in *Coleman* that the history given to the examining physician by the victim was not admissible under La. C.E. art. 803(4). This Court found the error was harmless, however, as the twelve-year old victim testified in detail about the incidents, which had only been briefly reported in general terms by the physician. In addition, the victim's mother testified to finding the defendant in an aroused state after the victim came running into her room following one attempted rape, and the defendant also made some inculpatory statements. The court found beyond a reasonable doubt that the improperly admitted testimony by the physician did not contribute to the verdict "in an otherwise strong case for the State." 95-1890 at p. 6, 673 So.2d at 1287.

In Author's Note (2), La. C.E. art. 803(4), Handbook on Louisiana Evidence Law, Pugh, Force, Rault & Triche, p. 657 (2011), the authors state that "it would appear that part of a declaration made to a physician by the victim of an alleged sexual assault identifying the perpetrator" "would not qualify under this exception."

However, in the instant case, as in *Thom*, and especially considering the testimony of Dr. Benton as to his need for the information insofar as referring the victim for treatment in the form of counseling for her psychological injuries, the statements appear to have been admissible for purposes of medical treatment and medical diagnosis in connection with treatment pursuant to La. C.E. art. 803(4).

Moreover, insofar as Dr. Benton testifying that T.W. told him that "Sam" was the perpetrator of the acts, this was merely cumulative to testimony by T.W. that the defendant assaulted her; to testimony by T.W.2 [T.W.'s mother] that T.W. told her the defendant had assaulted/impregnated her; and to the results of the DNA testing which identified the defendant as the father of T.W.'s unborn child.

The erroneous admission of evidence is subject to harmless error analysis. *State v. Hugle*, 2011-1121, p. 19 (La.App. 4 Cir. 11/7/12), 104 So.3d 598, 613, citing *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *State v. Walker*, 99-2868, p. 8 (La.App. 4 Cir. 10/18/00), 772 So.2d 218, 223. *See also State v. Johnson*, 389 So.2d 1302 (La.1980) (admission of hearsay testimony is harmless error when the effect is merely cumulative or corroborative of other testimony adduced at trial). An error is harmless if it can be said beyond a reasonable doubt that the guilty verdict rendered in the case was surely unattributable to that error. *State v. Robertson*, 2006-1537, p. 9 (La.1/16/08), 988 So.2d 166, 172; *State v. Barbour*, 2009-1258, p. 14 (La.App. 4 Cir. 3/24/10), 35 So.3d 1142, 1150.

Even assuming for the sake of argument that the trial court erroneously admitted any of the testimony by Dr. Benton as to what the victim told him about the acts perpetrated by the person who sexually abused her, including that the perpetrator's name was "Sam," it can be said beyond a reasonable doubt that the guilty verdict rendered in this case was surely unattributable to such error.

After reviewing the facts herein, unlike in *Williams*, it is not clear from the record that the identity of the offender was pertinent to the victims' medical treatment. However, any error was harmless in light of the State's strong case against Defendant. The evidence certainly supported the convictions.

Thus, Defendant has failed to show that the district court abused its discretion in allowing the evidence at issue to be admitted. This assignment of error lacks merit.

**ASSIGNMENT OF ERROR NUMBER THREE:**

In his third assignment of error, Defendant argues that the district court erred by not ruling on one of his pro se motions for new trial. This assignment rests on a faulty premise, as the record shows that the district court ruled on the motion at a hearing held on February 22, 2022. When Defendant's counsel filed his brief, the hearing transcript did not appear in the record. However, it was apparent from the minutes that the district court had conducted the February hearing and had addressed multiple motions for new trial. The transcript was later provided in a supplemental record.

While Defendant filed multiple motions for new trial, both through counsel and pro se, his appeal pertains to his pro se motion filed on February 7, 2022. On January 26, 2022, the court conducted a hearing addressing counsel's motion for new trial and denied it. The record contains a written motion and a written denial, also dated January 26, 2022. The pro se motion and an earlier counsel-filed motion

17

filed on January 3, 2022, simply alleged that the verdict was contrary to the law and the evidence.

On February 7, 2022, defendant filed a pro se motion for new trial. Counsel also filed a "Second Motion for New Trial," which the district court denied on February 15, 2022. On February 18, 2022, Defendant filed a pro se motion for mistrial. He acknowledges that the court ruled on this motion, which was denied.

The district court convened for sentencing on February 22, 2022; at that time, the court acknowledged the pro se motion for new trial and denied it in open court. Counsel then acknowledged that the court had denied his earlier motions for new trial. When the court announced it was prepared to proceed to sentencing, the Defendant responded that he wanted to file another pro se motion for new trial. He presented the motion to the court, along with some brief oral argument. The court recessed to consider the motion; when it returned it denied the motion in open court. The record also contains a written denial and a copy of the pro se motion, both dated February 22, 2022.

As the district court did rule on the pro se motion at issue, Defendant's argument lacks merit. For the same reason, his alternative argument that trial counsel was ineffective for failing to object to the district court's proceeding to sentencing also lacks merit.

Furthermore, we find that the merits of the pro se motion are not properly before this court, as the entire premise of the assignment of error is that the district court failed to rule on the motion. However, Defendant may be able to raise his merits-based arguments in the post-conviction relief process.

**ASSIGNMENT OF ERROR NUMBER FOUR:**

In his fourth and final assignment of error, Defendant argues that the district court violated his due process rights by failing to suppress the urine test that showed he had chlamydia. As previously noted, law enforcement obtained a warrant for Defendant to submit a urine sample to a SANE nurse. Said sample was then sent to an out-of-state lab for testing, and it indicated that Defendant had chlamydia. Defendant was later unable to obtain samples for independent testing, as will be explained below. Defendant argues that the unavailability of his urine sample for independent testing violated his due process rights and requires the test results be suppressed. The relevant statute is La.Code Crim.P. art 718 (emphasis added):

> Subject to the limitation of Article 723 of this Code, and except as otherwise prohibited by law, upon written motion of the defendant, the court shall order the district attorney to permit or authorize the defendant to inspect and copy, photograph or otherwise reproduce law enforcement reports created and known to the prosecutor made in connection with the particular case, and *to permit or authorize the defendant or an expert working with the defendant, to inspect, copy, examine, test scientifically*, photograph, or otherwise reproduce books, papers, documents, photographs, *tangible objects*, buildings, places, or copies or portions thereof *that are within the possession, custody, or control of the state*, and that are intended for use by the state as evidence in its case in chief at trial, or were obtained from or belong to the defendant.

Defendant's prior counsel, Catherine Stagg, obtained court authorization on August 22, 2018, to re-test the sample at Defendant's cost. Defendant filed another order on June 3, 2019, again seeking independent testing. Apparently, the requested tests had not been done, although nearly a year had passed since the first order.

Counsel Stagg consequently filed a motion to suppress on July 25, 2019, noting that the Lake Charles Police Department had advised her that it did not have possession of the testing samples. Defendant argued the motion to suppress, along with other matters, at a hearing held on August 2, 2019. Counsel noted the

19

possibility of a ten percent error rate in chlamydia testing. The district court took the matter under advisement and issued a written denial of the motion on August 8, 2019; however, the court mentioned that the State never "had possession, custody or control of [the victims'] vaginal samples as required by La. C.Cr.P. 718." The parties agree that the court's order did not specifically address Defendant's urine sample. On August 19, 2019, Defendant filed a pro se motion to suppress the same evidence. The court denied the pro se motion in writing on August 28, 2019.

Defendant now complains that the State was able to use the undoubtedly powerful evidence of the three positive chlamydia tests despite his inability to "cross-examine" the results. However, he appears to concede that the victims' samples were not tested with litigation in mind; thus, he focuses on his inability to have his own urine sample independently tested.[4]

The State argues that although Defendant's urine test was performed for a forensic purpose, the State did not have actual custody of the sample, as the hospital forwarded it to an out-of-state laboratory, Quest Diagnostics in California. Further, it notes that at trial, a Quest Diagnostics clinical lab scientist testified that urine samples degrade after thirty days. The State notes that Defendant did not file his motion for independent testing until August 22, 2018. This was approximately three years after the test, which was performed in 2015.

Both parties cite *State v. Clark*, 414 So.2d 737 (La.1982), although each highlights a different passage from it. In that case, the supreme court stated:

> This court recognizes that:
>
> " '. . . Fundamental fairness is violated when a criminal
> defendant on trial for his liberty is denied the opportunity

---

[4]Counsel Stagg noted at the hearing that the girls' tests were taken for medical, rather than forensic, purposes.

to have an expert of his choosing, bound by appropriate safeguards imposed by the Court, examine a piece of critical evidence whose nature is subject to varying expert opinion.' . . ." *State v. Gray*, 351 So.2d 448, 454 (La.1977).

*See Brady v. Maryland*, [373 U.S. 83, 83 S.Ct. 1194 (1963)]; *Barnard v. Henderson*, 514 F.2d 744 (5th Cir. 1975).

We held in *State v. Migliore*, 261 La. 722, 260 So.2d 682 (1972), that where there is a sufficient amount of the evidence, the defendant should be permitted to conduct an independent examination. But in no case was the charge against a defendant dismissed because he could not make an independent examination of the evidence or because the state suppressed exculpatory evidence.

. . . .

. . . The unavailability of the evidence for further testing does not in itself so prejudice defendant's right to a fair trial so as to warrant a dismissal of the prosecution. Defense counsel may still present evidence to the jury to show the inconclusive nature of the tests performed at the crime lab. The jury should be allowed to evaluate the testimony and determine what weight it is to be given. Therefore, the trial court erred in granting defendant's motion to quash the indictment in the aggravated rape case.

*Id*. at 740-41.

The State also cites more recent cases:

An appellant is not deprived of his due process rights based on the state's failure to preserve potentially exculpatory evidentiary material unless bad faith is demonstrated. *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988) (absent a showing of bad faith, "failure to preserve potentially useful evidence does not constitute a denial of due process of law."); *State v. Lindsey*, 543 So.2d 886, 891 (La.1989).

*State v. Harris*, 01-2730, p. 20 (La. 1/19/05), 892 So.2d 1238, 1253, *cert. denied*,

546 U.S. 848, 126 S.Ct. 102 (2005). Further, the State cites a case from this court:

Instead, the defendant contends that three items of evidence not introduced at trial were unavailable for independent examination and testing. The items were unavailable because they had been destroyed at some point in the twenty years between the crime and the trial. The state no longer had possession, custody, or control of those items, and

the defendant did not seek to examine those items until four days before trial, which was the day after the defendant filed his Motion in Limine. The defendant had an opportunity, both before and during trial, to question the individuals responsible for collecting and testing the evidence before its destruction.

Thus, there has been no violation of La.Code Crim.P. art. 718, of the defendant's right to due process, or of his right to confront and cross-examine the witnesses who testified against him.

*State v. Tolliver*, 08-1486, pp. 50-51 (La.App. 3 Cir. 5/13/09), 11 So.3d 584, 612-13, *writ denied*, 09-1441 (La 2/26/10), 28 So.3d 269.

Defendant has not shown any bad faith by the State, and the sample at issue had long since degraded by the time Defendant requested independent testing. In light of *Clark*, *Harris*, and *Tolliver*, the district court did not err by choosing not to suppress Defendant's urine sample. This assignment of error lacks merit.

**DECREE:**

For the foregoing reasons, Defendant Derrick C. Withers's convictions and sentences are affirmed.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2-16.3.